UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EDWIN BLOSSEY,

              Plaintiff,                   CIVIL ACTION NO. 12-15091

        v.                      DISTRICT JUDGE TERRENCE G. BERG

                                   MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

              Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON CROSS MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 12, 14)

Plaintiff Edwin Blossey challenges the Commissioner of Social Security's ("the Commissioner") final denial of his benefits application. Cross motions for summary judgment are pending (Dkt. Nos. 12, 14). Judge Terrence G. Berg referred the motions to this Magistrate Judge for a Report and Recommendation (Dkt. No. 2).

### I.     RECOMMENDATION

Because substantial evidence supports the Administrative Law Judge's ("ALJ") decision, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

### II.    DISCUSSION

#### A.  *Framework for Disability Determinations*

Under the Social Security Act (the "Act"), Disability Insurance Benefits and Supplemental Security Income are available only for those who have a "disability." *See Colvin v.*

-1-

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### B.   Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th

Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotation marks omitted). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

## III.   REPORT

### A.   Administrative Proceedings

Plaintiff applied for disability insurance benefits on June 10, 2010, alleging a disability onset date of June 27, 2008 (Tr. 12); the Commissioner denied the application (Tr. 12). Plaintiff appeared with counsel for a hearing before ALJ Mark B. Greenberg, who considered the case *de novo* (Tr. 22). In a written decision, ALJ Greenberg found Plaintiff was not disabled (Tr. 12-21). Plaintiff requested an Appeals Council review (Tr. 6-8). On November 1, 2012, the ALJ's findings became the Commissioner's final administrative decision when the Appeals Council declined further review (Tr. 1-3).

### B.   ALJ Findings

Plaintiff was 41 years old at the time of his alleged disability onset date (Tr. 19). He has a high school education (Tr. 19). The ALJ applied the five-step disability analysis to Plaintiff's

claim and found at step one that he had not engaged in substantial gainful activity since his alleged disability onset date in 2008 (Tr. 14).

At step two, the ALJ found that Plaintiff had the following "severe" impairments: bipolar disorder and right shoulder pain (Tr. 14).

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 14-15).

Between steps three and four, the ALJ found Plaintiff had the Residual Functional Capacity ("RFC") to perform:

> Light work[1] . . . except that [Plaintiff] is able to carry, push, and pull less than 20 pounds with his dominant right arm. He cannot repetitively carry, push, or pull on the right. He is limited to nonpublic, simple, routine, repetitive tasks. He should have minimal interaction with coworkers and supervisors. He should have only brief superficial interaction with others. His work should not be fast paced and should not involve production quotas. Finally, he should work in a static environment with occasional workplace changes introduced gradually.

(Tr. 16).

At step four, the ALJ found that Plaintiff could not perform any of his past relevant work (Tr. 19).

---

[1] Light work involves:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567.

At step five, the ALJ found Plaintiff was not disabled, because he could perform a significant number of jobs in the national economy (Tr. 20).

### C. Administrative Record

#### 1.    Plaintiff's Hearing Testimony and Statements[2]

For approximately three years, Plaintiff worked at Delphi Corporation, a subsidiary of GM, running an automated welding machine (Tr. 29). At some point, he began missing work because of pain in his shoulder (*Id.*). In 2008, Plaintiff suffered a workplace injury (Tr. 28). He took a sick leave and later accepted a buy-out because his employer would not allow him to return to work (Tr. 28, 30). Plaintiff has not been employed since (Tr. 28). However, Plaintiff applied for and received unemployment benefits through 2010 (Tr. 28-29). During that time, he looked for work for a little while, but was unsuccessful (Tr. 29).

Plaintiff had surgery on his right shoulder in February of 2009, but it did not help (Tr. 28, 32). If he uses his right arm repeatedly for a few minutes, it goes numb, swells up, and he cannot use it (Tr. 32-33). He is limited in twisting, turning, and reaching above and around his body (Tr. 33). He does not drive much anymore because he cannot turn around completely to check his blind spot (*Id.*).

Plaintiff has also suffered from bipolar disorder since he was seven years old (Tr. 35). On his hearing date, Plaintiff's condition was the same as it had been while he was working (*Id.*). At that time, he would miss work; was suspended; had to go through conflict resolution; was called names by coworkers; and, was made to work alone because no one wanted him around (*Id.*).

---

[2] Plaintiff's testimony before the ALJ reflects his subjective view of his medical condition, abilities, and limitations; it is not a factual finding of the ALJ or this Magistrate Judge.

Plaintiff described his bipolar condition as "really bad" – his mother's recent passing exacerbated his condition (Tr. 33). He does not sleep at night, but he sleeps a lot during the day (*Id.*). His medications make him tired; he sometimes has repetitive thoughts at night; and, his anxieties make it hard for him to engage in social activities (*Id.*). On bad days, he does not do much (*Id.*). Half of the time he does not leave his house at all (*Id.*). Plaintiff has gone as long as 150 days without leaving his house (Tr. 33-34).[3]

Plaintiff began attending a mental health counseling program in March of 2011 – he treats with Dr. Lenhart every six weeks, sometimes less, depending on how he is doing (*Id.*). His medication has been changed, and it seems to be helping a little (Tr. 33). And, although he still has difficulties, he has been able to "get out and do a little bit here and there" since he began counseling (Tr. 34).

Plaintiff's memory is failing; and at times, his medicine does not help at all (Tr. 34). Plaintiff forgets the simplest things, like taking his medicine, paying bills, or picking his children up on time, unless he leaves himself notes or his wife reminds him (*Id.*).

Plaintiff lives with his wife and son (Tr. 32). His wife does the yard work and most of the grocery shopping and lifting – he does not do much lifting (*Id.*). Plaintiff helps with some of the housework – he dusts, helps out with the dishes, occasionally cooks, and runs errands (*Id.*).

### 2.        Relevant Medical Evidence

#### a.        *Physical Limitations*

On December 9, 2008, Plaintiff treated with Branislav Behan, M.D. (Tr. 199-200). He reported right shoulder pain that began on June 5, 2008 (Tr. 199). He had a negative EMG; an MRI came back positive for partial thickness rotator cuff tear, but showed no other abnormalities

---

[3] The period of time to which Plaintiff refers is unclear.

(*Id.*). Plaintiff was treated with physical therapy (for his arm and shoulder pain), medication, and an injection, but the shoulder pain persisted (*Id.*). It woke him up at night, and he could not roll over in bed comfortably; he stated his pain was always above a 5 out of 10; pulling, pushing, and reaching with forward flexion of the shoulder aggravated his pain (Tr. 199). Dr. Behan sent Plaintiff back to work, but restricted him to no repetitive lifting of more than five pounds above the waist; he could perform fine motor manipulations with his hands (Tr. 200). Plaintiff was prescribed Skelaxin[4] and advised to return in six weeks for a follow-up (*Id.*).

In January of 2009, Plaintiff returned to Dr. Behan; his right shoulder continued to cause him significant pain which was aggravated by reaching and lifting (Tr. 197-198). Plaintiff planned to proceed with surgery to repair his shoulder in the near future (*Id.*).

Plaintiff had surgery in February of 2009 – Dr. Behan found partial thickness rotator cuff tear and impingement syndrome, but no muscle tear (Tr. 201). Shortly after the surgery, Plaintiff followed up with Dr. Behan; he noted a limited range of motion, and some stiffness in Plaintiff's shoulder (Tr. 196). Plaintiff had not had much pain since his operation, and had taken only one Vicodin since the surgery (*Id.*). Plaintiff said that his manufacturing job was terminated that day; but, he was starting a job at a restaurant in a month (*Id.*). Dr. Behan prescribed physical therapy and advised that Plaintiff follow up in a month (*Id.*).

Plaintiff returned to see Dr. Behan on March 24, 2009 (Tr. 195). He stated that he no longer had pain – it had "essentially disappeared" (*Id.*). Dr. Behan observed full shoulder motion

---

[4] "[Skelaxin] is used to relax certain muscles in [the] and relieve the discomfort caused by acute (short-term), painful muscle or bone conditions." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011119/?report=details (last accessed December 11, 2013).

and a strong rotator cuff (*Id.*). Although Plaintiff reported some discomfort lying on his right side, he was fine with daily activities, and everyone was "pleased with his progress" (*Id.*). Physical therapy was stopped – Dr. Behan recommended continuation of an at-home exercise program – and Plaintiff was told to follow-up as needed (*Id.*).

On August 18, 2010, Plaintiff was examined by Dr. R. Scott Lazzara for the state DDS (Tr. 232-38). He reported right shoulder pain since February of 2009, but was not undergoing any therapy at that time; he was doing range of motion exercises and ice and heat therapy at home (Tr. 234). He was not taking any pain medication (*Id.*). Though not as frequently as he used to, Plaintiff could perform his activities of daily living: he was driving, cooking, and doing some chores and yard work (*Id.*). He could lift about 10 pounds with his right arm up to his waist (*Id.*). On examination, Dr. Lazzara found normal musculoskeletal and range of motion studies; right shoulder tenderness, but no atrophy; normal grip strength; and, no difficulty with manipulative tasks (Tr. 235-36, 238). He opined that Plaintiff could carry, push, and pull no more than 20 pounds with his right arm, but could not perform those activities repeatedly; any discomfort was a result of post-surgical inflammation (Tr. 232, 238). He recommended anti-inflammatories and range of motion exercises (*Id.*).

### b. Mental Limitations

In July of 2008, Plaintiff presented to Barry D. Binkley, M.D. at List Psychological Services, PLC ("LPS") (Tr. 212). He was not doing well, and was having relationship problems with his fiancé (*Id.*). Dr. Binkley prescribed Pristiq, an anti-depressant (*Id.*).

Plaintiff continued to see Dr. Binkley regularly for medication review (Tr. 207-211). On June 17, 2009, Plaintiff discussed marital stress – including his wife's pregnancy – and noted that he would be applying for social security disability soon (Tr. 206). Pristiq was working,

though he had some anxiety during the day; Dr. Binkley prescribed Ativan, an anti-anxiety medication (*Id.*).

Between June of 2009 and January of 2010, Plaintiff continued treatment at LPS with a therapist, Rebecca Wilson-Longlet, LMSW ("Longlet") (Tr. 280-85, 287-92, 294-97). He complained of stressors – mostly family-related – irritability, and, at times, sleep issues (*Id.*). Longlet often noted depressed and anxious moods; found him to be moderately impaired; and consistently noted treatment plan progress as "fair" (*Id.*). On August 17, 2009, in a quarterly review of Plaintiff's treatment, Longlet noted that Plaintiff was having difficulty managing stressors and noted his wife's miscarriage (Tr. 293). In a November quarterly review of Plaintiff's treatment, Longlet noted that Plaintiff's treatment focused on increasing his stress tolerance and insight into how his behavior affects others; he continued to take Pristiq and Ativan (Tr. 286).

On January 9, 2010, Plaintiff saw Mohammed Jafferany, M.D. for a psychiatric evaluation after losing his insurance coverage (Tr. 224). He discussed his history of bipolar disorder, which began at age seven (*Id.*). His current medication was helping him a lot, and he was no longer experiencing mood swings, depression, or anxiety (*Id.*). However, when he did not take his medication, he could not think straight and became very impulsive, angry, frustrated, and annoyed (*Id.*). Plaintiff explained that he had been taking his medication and seeing a psychiatrist for a little over a year, but, because he was newly uninsured, he had been forced to pay out of pocket for medication and unable to see a psychiatrist (*Id.*). Upon examination, Dr. Jafferany found Plaintiff to be engaged with good eye contact; appropriate affect; no hallucinations, delusions, or paranoia; no homicidal or suicidal ideations; fair insight and judgment; fair attention and concentration; and, average cognitive abilities (Tr. 225-26). Dr.

Jafferany diagnosed recurrent and moderate major depressive disorder; he concluded that Plaintiff was stable on medications and treatment was helping his mood (Tr. 226).

Plaintiff continued to treat regularly with Longlet between January and March of 2010 (Tr. 274-75, 277-83). He continued to report stressors related to his family, and, at times, presented as anxious or depressed; Longlet continued to note that he was moderately impaired, and showed fair treatment progress (*Id.*).

On March 6, 2010, Plaintiff returned to Dr. Jafferany for medication review (Tr. 228). He was doing very well on Pristiq, and – although he sometimes felt down – he denied mood swings, symptoms of depression, sleep problems, and low motivation or energy (*Id.*). Plaintiff said therapy was very helpful (*Id.*).

On April 9, 2010, Plaintiff presented to a nurse in Dr. Jafferany's office (Tr. 227). He reported that he was stable on his medications and felt much better; he denied mood swings, sleep issues, panic attacks, and medication side effects; he reported irritability, occasional fatigue, and fluctuating anxiety; and, he rated his depressed mood at a 3 to 4 out of 10 (*Id.*).

In the meantime, Plaintiff continued to treat with Longlet from March of 2010 through September of 2010 (Tr. 252-75). During these sessions, Plaintiff reported feelings of grief and loss following his mother's death in April; conflict with his sister and wife; occasional difficulty sleeping; financial stressors; occasional depressed or anxious mood; self-care issues; and, difficulty managing feelings of anger and frustration (Tr. 254). At each visit, Longlet found Plaintiff to be moderately impaired in functioning, and she often rated his treatment plan progress as fair (*Id.*).

In August of 2010, Mark Garner, Ph.D., evaluated Plaintiff's medical records for the state DDS (Tr. 246-48). Dr. Garner opined that Plaintiff was moderately limited in his ability to carry

-11-

out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and, get along with coworkers or peers without distracting them or exhibiting behavioral extremes (*Id.*). He believed Plaintiff's symptoms would have some difficulty completing detailed tasks; but, he could do one- and two-step tasks on a sustained basis and interact with others when needed (*Id.*).

On September 2, 2010, Plaintiff was discharged from LPS and transferred to Michigan Psychiatric and Behavioral Associates ("MPBA") (Tr. 250-51). Longlet completed the discharge form: Plaintiff was diagnosed with bipolar disorder and shoulder pain; his prognosis was guarded; and, his treatment progress was fair (Tr. 250). She noted Plaintiff's labile mood and poor impulse control, and found marked impairments in his marriage and family relations, job performance, friendships, financial situation, activities of daily living, eating and sleeping habits, sexual functioning, temper control, and concentration (Tr. 251).

On September 14, 2010, Plaintiff presented to MPBA for an assessment because his mother's death was exacerbating his mental health symptoms (Tr. 301-07). He was still going out to hunt; but, he had been isolating himself and did not want to deal with people (Tr. 301). Plaintiff was independent in his activities of daily living (Tr. 304). He rated his depression at a 4 ¾ out of 5, and his anxiety at a 5 out of 5 (Tr. 305). He was grieving the loss of his mother, and discussed feelings of rage: he admitted to homicidal ideations, but had no intent at that time (*Id.*). He was diagnosed with severe bipolar disorder with psychotic features (Tr. 306).

On October 25, 2010, Plaintiff presented to Anne Tadeo, M.D. for a psychiatric evaluation (Tr. 299-300).[5] Plaintiff discussed his mother's death and its exacerbation of his mental illness; he felt overwhelmed by financial and family difficulties, unemployment, and limited social support (Tr. 299). He was experiencing depression, mood swings, irritability, sleep disturbances, bad dreams, sexual side effects, appetite fluctuation, paranoia, and difficulty with focus and concentration (*Id.*). His irritability and racing thoughts remained uncontrolled despite his medication; Dr. Tadeo explained that Pristiq is not a mood stabilizer, but he did not wish to be put on Lithium[6] or Abilify[7] (*Id.*). Dr. Tadeo noted a labile mood with congruent affect; some paranoid delusions; fair to poor focus, concentration, and memory; fair insight and judgment; and, poor impulse control (Tr. 300). She prescribed Seroquel[8] and advised follow-up in six to eight weeks (*Id.*).

---

[5] He reported that he was still receiving unemployment at that time (Tr. 299).

[6] "Lithium is used to treat and prevent episodes of mania (frenzied, abnormally excited mood) in people with bipolar disorder (manic-depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods). Lithium is in a class of medications called antimanic agents. It works by decreasing abnormal activity in the brain." *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681039.html (last accessed December 12, 2013).

[7] "[Abilify] is a medication that works in the brain to treat schizophrenia. It is also known as a second generation antipsychotic (SGA) or atypical antipsychotic. [Abilify] rebalances dopamine and serotonin to improve thinking, mood, and behavior." *See* http://www.nami.org/Template.cfm?Section=About_Medications&template=/ContentManagement/ContentDisplay.cfm&ContentID=8133 (last accessed December 12, 2013).

[8] "[Seroquel] is used to treat nervous, emotional, and mental conditions (eg, schizophrenia). It may be used alone or together with other medicines (eg, lithium or divalproex) to treat symptoms of bipolar disorder (manic-depressive illness) or mania that is part of bipolar disorder." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011909/?report=details (last accessed December 12, 2013).

Plaintiff returned to Dr. Tadeo on December 22, 2010 (Tr. 298). He had been doing fairly well on Pristiq, and although he was still having anger outbursts, they were no longer as intense or severe (*Id.*). He denied depressive episodes and verbalized no hallucinations or delusions (*Id.*). Dr. Tadeo found improved mood with congruent affect; improved focus, concentration, and memory; and, fair insight and judgment (*Id.*). Plaintiff reported anxiety, noting that he had previously taken Valium; Dr. Tadeo added an anxiety disorder diagnosis (*Id.*). She started him on Valium as needed, continued him on Pristiq, and asked that he follow up in two to three months (*Id.*).

In May of 2011, Harold Lenhart, M.D., completed a medical source statement form (Tr. 307-08). He listed major depression as Plaintiff's diagnosis, and opined that Plaintiff was mildly limited in his ability to understand, remember, and carry out simple one- or two-step job instructions; moderately limited in his ability to understand, remember, and carry out an extensive variety of technical and/or complex job instructions, and handle funds; markedly limited in his ability to relate and interact with supervisors and coworkers, and maintain concentration and attention for at least two hour increments; and, extremely limited in his ability to deal with the public and withstand the stress and pressures associated with an eight-hour workday and day-to-day work activity (Tr. 307). Dr. Lenhart stated that these limitations had existed for over three years (*Id.*).

### 3.       Vocational Expert

The ALJ asked a vocational expert ("VE") to assume a hypothetical individual of Plaintiff's age, education, and past work experience, who was right-arm dominant and could perform light work with the following limitations: he could carry, push, or pull less than 20 pounds on the right, with no repetitive carrying, pushing, or pulling on the right; he was limited

-14-

to non-public, simple, routine, repetitive tasks with minimal interaction with co-workers or supervisors, and only brief, superficial interaction with others; no fast-paced work, no production quotas; and, a static environment where change is occasional and gradually introduced (Tr. 40).

The VE testified that such an individual could not perform Plaintiff's past relevant work (*Id.*). But, the individual could perform other jobs in the national and regional economy: a light cleaning position; an office-type cleaner job, such as third shift after hours on a small work crew; production inspector; and, office helper (Tr. 41-42).

In a second hypothetical, the ALJ added that the individual would be unable to relate to, or interact with supervisors or co-workers; maintain attention or concentration for at least two-hour increments; and, withstand the stress and pressure associated with an eight-hour workday and day-to-day work activity (Tr. 42). The VE testified that such a combination of factors would preclude work, as would each factor independently (*Id.*). The VE added that absences in excess of two days a month would preclude work (*Id.*).

### D.  Plaintiff's Claims of Error

#### 1.    Dr. Lenhart's Opinion

Plaintiff argues that the ALJ erred in affording "little" weight to Dr. Lenhart's opinion. He argues that "Dr. Lenhart's records [] are . . . objective evidence that back up [Plaintiff]'s subjective complaints which render him incapable of interacting with the general public – and, ultimately, explain why [Plaintiff] was confined to his home for 150 days" (Dkt. No 12 at p. 11 (CM/ECF),[9] citing Tr. 34).[10]

---

[9] All page numbers refer to CM/ECF pagination.

[10] The pertinent exchange is as follows:

The Sixth Circuit has instructed ALJ's on how to assess opinions from treating sources:

Treating-source opinions must be given controlling weight if two conditions are met: (1) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) the opinion is not inconsistent with the other substantial evidence in [the] case record. If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence.

The Commissioner is required to provide good reasons for discounting the weight given to a treating-source opinion. These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. This procedural requirement ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376 (6th Cir.2013) reh'g denied (May 2, 2013)

(internal citations and quotations omitted). Here, the ALJ accorded Dr. Lenhart's opinion

"limited weight":

The claimant's psychiatrist, Harold Lenhart, M.D., opined on a checklist form that the claimant was extremely limited in his ability to deal with the public. Dr. Lenhart also opined that the claimant was markedly limited in his ability to relate with supervisors and

---

Q: Okay. When you said some days it's bad where you don't even leave the house, how often is that happening in a, let's say, how, how much, how many times a month on an average or how many months out of a year or what frequency is it?

A: I can easily say that I've went as high as 150 days without leaving the house.

Q: When was that?

A: Not all that long ago. I started, I -- with no insurance it's hard to get any help for my mental because everybody wants insurance. And thankfully in Bay County there's a program called Crossroads that recently started and it's for all uninsured, mentally ill people. And I was able to go there. And in March I started going and since then I've been able to get out and do a little bit here and there with the help of counseling but it's still hard.

(Tr. 34).

-16-

coworkers. Form reports in which a doctor's obligation is only to check a box, without explanations of the doctor's medical conclusions, are weak evidence at best. Furthermore, Dr. Lenhart's opinion is inconsistent with the claimant's positive response to treatment and his generally unremarkable mental status examinations. Therefore, the undersigned gives little weight to Dr. Lenhart's opinion.

(Tr. 18).

Plaintiff testified that he had been seeing Dr. Lenhart every six weeks, but otherwise, there is no evidence to show the nature, frequency, or duration of Dr. Lenhart's treatment relationship with him, let alone the methods by which Dr. Lenhart arrived at his opinion (Tr. 307-08). The May 2011 form is the only evidence on record associated with Dr. Lenhart; it contains no elaboration beyond Dr. Lenhart's selection of discrete functional categories (Tr. 307-08). *See* 20 C.F.R. § 404.1527 (c)(3) ("[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion"). As such, the ALJ was not required to give controlling weight to Dr. Lenhart's opinion.

Furthermore, the ALJ explained that Dr. Lenhart's opinion was inconsistent with medical evidence showing that Plaintiff responded to treatment, and other opinion evidence, such as that of non-examining state agency medical consultant Dr. Garner: he opined that Plaintiff retained the ability to do one- and two-step tasks on a sustained basis (Tr. 16, 18-19, 246-48). *See* 20 C.F.R. § 404.1527(c)(4) ("[g]enerally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion"). Moreover, the ALJ incorporated significant mental limitations into Plaintiff's RFC. Plaintiff was to have *no* contact with the public (Tr. 16, 18). And, Plaintiff was to have only minimal interaction with coworkers and supervisors, and brief superficial interaction with others; even if the ALJ had erred in his

evaluation of Dr. Lenhart's opinion, the ALJ's RFC is not inconsistent with Dr. Lenhart's opinion that Plaintiff was markedly limited in his ability to interact with coworkers and supervisors (Tr. 16). *See Osacar v. Colvin*, CV-12-5040-LRS, 2013 WL 5491899, at *5 (E.D. Wash. Oct. 1, 2013) (analogously, the court found an RFC that precluded more than superficial contact with the general public to be consistent with a medical opinion that claimant had marked limitations in her ability to interact with the general public); *Holmes v. Comm'r of Soc. Sec.*, No. 1:12-cv-324, 2013 WL 6094629, at *11 (E.D. Tenn. Nov. 20, 2013) ("Even if the ALJ had not properly complied with the treating physician rule and had not given [the treating physician]'s statement controlling weight, . . . a violation of the 'good reasons' rule would be harmless error . . . where the Commissioner . . . made findings consistent with [his] opinion[.]" (citing 20 C.F.R. § 404.1527(c)(2); *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011))).

Plaintiff claims that "[t]he ALJ dismissed [Dr. Lenhart's opinion] . . . because Dr. Lenhart was asked 'only to check a box'" – this oversimplifies the ALJ's reasoning. (Dkt. No. 12 at p. 10). The ALJ's evaluation of Dr. Lenhart's opinion is supported by substantial evidence and should not be disturbed on appeal.

## 2.   VE Testimony

Plaintiff next argues that the ALJ's hypothetical to the VE was inaccurate because it did not accurately portray his limitations. Specifically, he argues that the ALJ erred: (1) in finding that he could carry, push, and pull up to 20 pounds – this capability, Plaintiff argues, is an

erroneous assumption; and, (2) in neglecting to incorporate Plaintiff's need for social seclusion and frequent absences (Dkt. No. 12 at pp. 10, 12).[11]

Plaintiff bears the burden to establish a prima facie case of disability. *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980). At step five, the burden shifts to the Commissioner to show that Plaintiff has the capacity to perform work in the national economy. *Id.* This burden must be met with a finding supported by substantial evidence. *Parley v. Sec'y of HHS*, 820 F.2d 777, 779 (6th Cir. 1987). Substantial evidence may be shown through reliance on a VE's testimony in response to a hypothetical question, as long as the question accurately describes Plaintiff's physical and mental impairments, and takes Plaintiff's limitations into account. *Id.* at 779-80. The hypothetical question need not incorporate limitations the ALJ does not find credible. *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993). And, "[c]redibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ." *Strevy v. Comm'r of Soc. Sec.*, No. 1:12–cv–634, 2013 WL 54472803, at *8 (W.D. Mich. Sept. 30, 2013) (citing *Gooch v. Sec'y of HHS*, 833 F.2d 589, 592 (6th Cir. 1987)). This Magistrate Judge finds the ALJ provided sufficient reasons for rejecting Plaintiff's claims of disabling symptoms.

In his decision, the ALJ stated "[Plaintiff]'s medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (Tr. 17). Plaintiff's support for his argument consists entirely of his own testimony, yet he does not

---

[11] Plaintiff also suggests that the ALJ erred in failing to incorporate Dr. Lenhart's opinion into his hypothetical to the VE (Dkt. No. 12 at p. 17 (CM/ECF)). But, as discussed above, the ALJ appropriately accounted for his opinion.

-19-

contest the ALJ's credibility finding. Nevertheless, the ALJ discussed the reasons for his findings, and those findings are supported by substantial evidence.

As to physical limitations, the ALJ noted that Plaintiff reported to his medical sources a quick and successful recovery after surgery on his right shoulder: in March of 2009, Plaintiff told Dr. Behan that he felt no pain and had no trouble with his daily activities; in August of 2010, Dr. Lazzara observed some tenderness, but there was full range of motion in Plaintiff's right shoulder, and Plaintiff reported less frequency of some daily activities, but no need for pain medication (Tr. 17, 195, 232-38). Dr. Lazzara opined that Plaintiff could lift, carry, and pull up to 20 pounds with his right arm, but not repeatedly (*Id.*), and the ALJ's RFC provided such a limitation (Tr. 16). Plaintiff argues that the ALJ neglected Plaintiff's reported difficulty twisting, turning, and reaching above or around with his right arm. But, no medical evidence supports such limitations, nor does Plaintiff make any attempt to argue that it does.

As to Plaintiff's mental limitations, the ALJ noted that he had not required psychiatric hospitalization; showed good response to treatment; reported doing "fairly well" on his medication; had generally unremarkable mental status examinations; reported improved mood and memory; and, complained of no medication side effects (Tr. 17). He continued: "[t]o the extent that [Plaintiff] experiences symptoms, they are benign with respect to any continuous period of not less than 12 months" (*Id.*). The ALJ also explained that Plaintiff had previously worked with his mental illness, and, without any credible evidence of a worsening of his condition, could be expected to continue working; and, Plaintiff had been collecting unemployment and looking for work during the alleged period of disability (Tr. 18). *See Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801-02 (6th Cir. 2004) ("[a]pplications for unemployment and disability benefits are inherently inconsistent." (citations omitted)).

Nevertheless, the ALJ reflected Plaintiff's difficulties in social functioning and concentration, persistence, and pace by designating limitations that included "nonpublic, simple, routine, repetitive tasks" (Tr. 16). This Magistrate Judge finds substantial evidence supports the ALJ's finding that Plaintiff could perform light work with the mental and physical restrictions specified in the ALJ's RFC. His decision should not be disturbed on appeal.

## IV.     CONCLUSION

Because substantial evidence supports the Administrative Law Judge's ("ALJ") decision, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of sa copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length

unless, by motion and order, the page limit is extended by the court. The response shall address

each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon
Mark A. Randon
United States Magistrate Judge


Dated:  December 18, 2013



*Certificate of Service*

    *I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, December 18, 2013, by electronic and/or ordinary mail.*

*s/Eddrey Butts*
*Case Manager for Magistrate Judge Mark A. Randon*